UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DOUGLAS HOLMES                              CIVIL ACTION

v.                                          NO. 12-1890

SHELL OFFSHORE INC., ET AL.                 SECTION "F"


ORDER AND REASONS

Before the Court are three motions: (1) Shell Offshore Inc.'s motion for summary judgment on plaintiff's claims; (2) Shell Offshore Inc.'s motion for summary judgment against third-party defendant, Helmerich & Payne International Drilling Company; and (3) Petrofac Training, Inc.'s motion for summary judgment.  For the reasons that follow, Shell's motions are GRANTED and Petrofac's motion is DENIED.

**Background**

This litigation arises out of personal injuries allegedly sustained by Douglas Holmes in April 2011 during a helicopter emergency underwater escape training exercise conducted by Petrofac Training, Inc. on Shell Offshore Inc.'s property.

Shell Offshore Inc. owns the Shell Robert Training and Conference Center, a 20-acre training facility located in Robert, Louisiana that is comprised of classrooms, labs, and conference facilities.  The purpose of the facility is to provide a training

1

resource to prepare and ensure the safety of workers in the oil and gas industry.

In 1997 Helmerich and Payne International Drilling Co. executed a Training Agreement with Shell to obtain training for its employees and to utilize the facilities at Shell's Robert Training Center; it provides:

> Whereas, COMPANY [H&P] desires to obtain training in certain courses and/or utilize facilities and SOI [Shell] has agreed to provide training or space on a space-available basis at its Robert Training Center as identified on the current version of Course Offerings attached hereto as Exhibit "A", which Course Offerings may be amended from time to time.

The Training Agreement contains provisions referencing course offerings, enrollment and lodging, student and class cancellations, notices of course completion, warranty disclaimer, and a Louisiana choice of law clause. It also provides an indemnity provision, requiring H&P to indemnify, defend, and hold harmless Shell from and against any personal injury alleged by its employees:

> 6.  LIABILITY AND INDEMNITY:
>     COMPANY [H&P] shall indemnify, defend, contribute to and hold harmless SOI [Shell], its employees, officers, directors, from and against: (1) all personal injury or death of its employees, its contractors, or any other party...arising out of or related to the training or practices or procedures received at the Robert Training Center even if caused by SOI's [Shell's] negligence, fault, or defect in materials, methods, or presentation received in course instruction by SOI [Shell] at the Robert Training Center.

Separately, Shell and H&P also had a contractual relationship

2

governing drilling services.[1]  A Master Drilling Agreement was executed in 1985 and, several years after entering into the Training Agreement, in 2001, Shell and H&P executed a Master Services Agreement for well services: H&P is a drilling contractor with rigs drilling in the Gulf of Mexico on operator-owned platforms like H&P's Rig 406, which operates on Shell's Auger tension leg platform located at Garden Banks Block 426, OCS Lease Number g-08241 on the Outer Continental Shelf.

One of the courses offered at Shell's training facility is helicopter safety training known as helicopter underwater egress training (HUET).  Shell contracted with Petrofac Training Inc. to conduct and supervise the HUET at Shell's facility.  In delegating the HUET training to Petrofac, Petrofac was responsible for conducting the training, maintaining and performing the daily inspection of the METs helicopter simulator, perform all classroom instruction and training, including the details, course materials, and selection of instructors. The Shell-Petrofac Contract provides:

**Section II      TERMS AND CONDITIONS**

**15. PERFORMANCE**

CONTRACTOR [Petrofac] shall perform all Work diligently, carefully and in a good and workmanlike manner; shall furnish all labor, supervision, machinery, equipment, materials, and supplies necessary therefore; shall obtain and maintain all building and other permits and licenses

---

[1]In fact, H&P submits that any H&P personnel undertaking training at Shell's facility are doing so in order to work on a Shell drilling operation.

3

required by public or governmental authorities in connection with the performance of Work under this Contract...CONTRACTOR shall conduct all operations in CONTRACTOR's own name and as an independent CONTRACTOR, not in the name of, or as agent for COMPANY [Shell]. Any provisions in this Contract, which may appear to give COMPANY the right to direct CONTRACTOR as to details of performing the Work covered by this Contract, or to exercise a measure of control over Work shall be deemed to mean that CONTRACTOR shall follow the desires of COMPANY in the results only of the WORK by this Contract. ...

**18.   USE OF PREMISES**

CONTRACTOR shall perform all Work in such manner as to cause minimum interference with the operations of COMPANY and other contractors of COMPANY on the Worksite, and shall take, and cause CONTRACTOR'S and its Subcontractor's employees, agents, licensees, and permittees to take all necessary precautions (including those required by COMPANY's safety regulations) to protect the Worksite and all persons and property thereon from damage or injury. CONTRACTOR confirms that safety shall be a primary consideration in its performance of Work hereunder, and CONTRACTOR shall meet with appropriate COMPANY personnel to review all Worksite-specific safety regulations prior to the performance of Work. CONTRACTOR shall investigate accidents (and cooperate with COMPANY in conducting investigations of accidents) that arise out of CONTRACTOR's Work hereunder and provide copies of non-privileged accident reports it produces in response to any such investigations. Upon completion of the Work, CONTRACTOR shall leave the Worksite clean and free of all equipment, waste materials and rubbish.
...

**22.   INDEPENDENT CONTRACTOR**

...CONTRACTOR shall be an Independent contractor with respect to the performance of Work under this Contract...COMPANY further reserves no right to supervise or control the details of the Work provided by CONTRACTOR or its Subcontractor(s), as COMPANY is interested solely in the finished product. In performing the Services hereunder, CONTRACTOR shall maintain complete control over and have full responsibility for its employees and agents...COMPANY reserves no right to direct, supervise

or control the operations, employees or Subcontractor(s) of CONTRACTOR.

**SECTION IV        SCOPE OF WORK**
**1.  GENERAL**
This order shall constitute an agreement by CONTRACTOR to furnish all tools and equipment, materials (except COMPANY furnished material), software, labor and supervision to provide HUET Training...
It shall be the CONTRACTOR'S responsibility to see that such activities are performed in such a manner as to yield results in accordance with COMPANY'S project objectives.

**2.  HUET TRAINING**

CONTRACTOR  is responsible for handling operation, maintenance, and security of the METS (simulator) and other equipment...
CONTRACTOR will perform day-to-day and other prescribed maintenance.  Daily care and maintenance on the METS is of upmost importance. All manufacturer's recommendations shall be attended to as prescribed; especially complete & thorough wash down of the METS.  Any parts/materials needed will be reported to the COMPANY in a timely manner.
CONTRACTOR will maintain inventory...
CONTRACTOR is accountable to provide experienced and trained staff as per HSE0039 and other requirements....

**SECTION VI        HEALTH SAFETY SECURITY ENVIRONMENT**
**                (HSSE) REQUIREMENTS**
CONTRACTOR shall be solely responsible to comply with and enforce any applicable Federal, State, and local safety and health regulations, as well as safety and health requirement at its own facilities, COMPANY's facilities or at any third party facility where Work hereunder is being performed.  CONTRACTOR will comply and enforce COMPANY's HSSE requirements while performing work on COMPANY's Worksite...CONTRACTOR's supervisor will be held solely responsible for the action fo the crew under his/her supervision....

In accordance with its duties to manage the day-to-day helicopter safety training, Petrofac screened each HUET trainee for health issues.  In particular, each trainee had to complete an initial "Self Declaration of Fitness for Attending Training" form generated by Petrofac:

5

...

Industry standards require those who commute by helicopter shall complete HUET training every four years to ensure that offshore personnel know how to conduct themselves safely in the event of an emergency.  To comply with industry standards, the plaintiff Douglas Holmes -- who worked offshore and was transported to and from his worksite every 14 days by helicopter -- participated in HUET training in 2007 when he began working for H&P as a roughneck.[2]  Holmes completed the 2007 HUET training without incident even though, two years prior to joining H&P, in 2005, Holmes had back surgery.[3]

After working for H&P for four years, Holmes was due for another helicopter safety training course.  This time, Holmes attended the two-day HUET training course at the Shell Robert Training Center on April 4 and 5, 2011.[4]  Part of the training

---

[2]As the name implies, a roughneck performs hard manual labor on oil rigs and ships.  While working for H&P, Holmes was assigned to Rig 406, which operates on Shell's Auger tension leg platform.

[3]Holmes disclosed his back condition; after he underwent a functional capacity evaluation, H&P's medical evaluator nevertheless cleared him to perform heavy manual labor.  In fact, H&P performed three medical evaluations on Holmes prior to the April 2011 training; every evaluation referenced his back injury, but approved him to work offshore. He performed his job without any physical problems.

[4]Holmes says that his first HUET training in 2007 was at a different facility but that the training was "similar" to that he received at Shell.

course involves classroom instruction and video and the other part involves practical training, swimming exercises and, ultimately, escaping from a 6-seat helicopter simulator called the Orient Express. Each trainee is secured to their chair in the simulator by a harness. There are six separate stages of this practical portion of the training, forcing the trainees to escape the simulator in progressively more difficult simulated emergency scenarios, including with the simulator being slowly lowered into the water, and then with it sinking faster (but with the windows already open), then with it rolling or flipping over while completely submerged (with the window exits closed so that the trainees must push them out). Depending on the stage of the training, the trainees are close to the exits or must cross the cabin of the simulator to get to an exit. At some point during the training, before attending the pool instruction with the METs helicopter simulator on April 5, Petrofac provided Holmes with a Self Declaration of Fitness for Attending Training form, which provided:

Course activities may include, but are not limited to:

- Moving through the water using your arms, while wearing a life jacket and/or an immersion suit.
- Holding your breath to egress underwater in a helicopter simulator module.
- Entering the water from the pool side, or a height.
- Towing other persons in the water.
- Pulling action on the upper body when climbing in or out of the pool or life raft.
- Breathing from emergency breathing devices.
- Sitting in a classroom environment for at least 50 minutes.

| PLEASE CHECK ANY OF THE BOXES THAT APPLY | YES | NO |
|---|---|---|
| 1.  Do you feel physically capable of performing the above listed activities? | x | |
| 2.  Have you been treated or been in the care of a doctor in the last 12 months for any medical condition? | | x |
| 3.  If YES to the above question, do you have a medical release to be back to full working duties? | | |
| 4.  Have you taken any medication in the last 24 hours that could impair your ability to perform any of the above listed activities? | | x |
| 5.  Have you ever had a traumatic experience in the water and/or do you have any fear associated with being in the water? | | x |

I understand that I may be removed from course at any time if in the opinion of staff I am incapable of continuing the course for any reason.  The circumstances will be reported to my employer or sponsor if applicable.

I have read the above, confirm that the information I have supplied is accurate and that I have not withheld any information regarding the status of my health. I understand that if I suffer any medical symptoms or problems during my training that I will inform a member of the staff immediately.

Signature: _____  Date: _____

Holmes signed the form, affirming (as indicated) that he felt physically capable of participating in the training.  (Holmes did not advise Petrofac of his prior back injury and surgery).  Holmes completed the training on April 5, without apparent incident,[5] and received his certificate of completion.  Then he drove home to Mississippi.

Six weeks after training, on May 20, 2011, Holmes told his employer that he injured his back during the April 2011 HUET training.  Whether or not Holmes injured his back during the

---

[5]He never reported to anyone at the HUET training that he injured his back during the training.

8

training is in dispute.[6]  What is not in dispute is: Holmes did not
report the alleged injury-causing incident to anyone at Petrofac
during the HUET training; Holmes worked an additional two (14-days-
on/14-days-off) shifts without notifying anyone of his injury;
Holmes was using a sledge hammer on the rig when his pain became
unbearable and he felt he had to tell his employer about his back
pain.  Since August 30, 2011 Holmes has been receiving benefits
under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.
§ 901, et seq.

On July 19, 2012 Holmes sued Shell Oil Company to recover for
the alleged "severe and permanently disabling" back injury during
the helicopter simulation portion of the emergency training.[7]
During the next several months, Holmes amended his complaint,
naming the correct Shell entity, Shell Offshore Inc., and adding
Petrofac Training Inc. as a party.[8]  Holmes alleges that the
negligence of Shell and Petrofac caused his back injury.  On March
7, 2014 the Court granted Shell's request for leave to file third-
party complaints against Kinsale Insurance Company (Petrofac's
insurer) and Helmerich & Payne International Drilling Co.; Shell

---

[6]Holmes says that he hurt his lower back during one of
the rollovers in the simulator but it really started bothering him
when he got home to Mississippi.

[7]This lawsuit was the first time Shell had been notified
that Holmes was injured.

[8]Shell Oil company was dismissed as an improper party on
January 15, 2014.

alleges entitlement to defense and indemnity.  That same day, this Court issued an order notifying counsel "[i]n view of the delays the Court has encountered in this 2012 case, the Court will, when appropriate, decide whether sanctions should be imposed pursuant to 28 U.S.C. § 1927."  See Order dated March 7, 2014.  In April 2014 Shell filed a cross-claim against Petrofac, alleging that Petrofac failed to procure adequate insurance coverage, that Shell is entitled to indemnity or contribution from Petrofac, and that Petrofac is liable for negligent misrepresentation and for Shell's detrimental reliance on Petrofac's promise to insure its contractual liabilities.

Shell now seeks summary judgment dismissing the plaintiff's claims, as well as summary judgment on its demand for contractual defense and indemnity from the third-party defendant H&P.  Petrofac also seeks summary judgment dismissing the plaintiff's claims against it.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine dispute of

fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. <u>See</u> <u>id.</u> Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. <u>Id</u>. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. <u>See</u> <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. <u>Id.</u> Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987); Fed.R.Civ.P. 56(c)(2). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255.

II.
*A.*

1.  Ordinary Negligence

"Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it."  La. Civ. Code art. 2315(A).  "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."  La. Civ. Code art. 2316. Courts employ the duty-risk analysis to determine whether to impose liability based on these broad negligence principles.  See Lemann v. Essen Lane Daiquiris, 923 So. 2d 627, 633 (La. 2006).

This duty-risk analysis requires a plaintiff seeking to recover for negligence to prove five elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element);
> (2) the defendant's conduct failed to conform to the appropriate standard (the breach element);
> (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element);
> (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and
> (5) the actual damages (the damages element).

Id. (citation omitted).  Shell's separation from the HUET process triggers several state law issues.

2.  Custodial liability

Louisiana Civil Code article 2317.1[9] provides:

---

[9]La.Civ.Code art. 2317 instructs that "[w]e are responsible, not only for the damage occasioned by our own act, but

12

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

La.C.C. art. 2317.1. Custody is key; the defendant must be in custody of the object that is the cause of the plaintiff's injury. Venezia v. ConocoPhillips Co., No. 12-2168, 2014 WL 107962, at *10 (E.D. La. Jan. 9, 2014)(citing Ainsworth v. Shell Offshore, Inc., 829 F.2d 548, (5th Cir. 1987)). "Custody" means "supervision and control." Id.

Ownership presumptively establishes the requisite benefit, control, and authority to find custody or garde. See Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La. 1991). But this presumption is rebuttable by the owner if the owner neither controlled the object, nor did it receive a substantial benefit from its ownership. Id.; Venezia, 2014 WL 107962, at *10. Similarly, even absent ownership a person can have custody or garde over something if he "bears such a relationship as (1) to have the right of direction and control over [it], and (2) to draw some kind of benefit from [it]." See Anh Ngoc Vo v. Chevron, U.S.A., Inc., No. 13-1794, 2013 WL 3983934, at *5 (E.D. La. July 31, 2013)(Engelhardt, J.)(quoting King v. Louviere, 543 So.2d 1327,

---

for that which is caused by ... the things which we have in our custody...."

13

1329 (La. 1989)); see also Coulter v. Texaco, 117 F.3d 909, 913 (5th Cir. 1997).   Both factors must be present.   Id.   Notably, when injury is caused by a specific thing, that thing is considered "the object" with respect to the issue of custody; and, the property on which the injury occurred is not considered "the object" unless an inherent defect in the property caused the injury.   See Doughty v. Insured Lloyds Ins. Co., 576 So. 2d 461, 464 (La. 1991)(defective machinery located on the property was considered "the object", not the property itself); see also Dupree v. City of New Orleans, 765 So. 2d 1002 (La. 2000)(where cause of the injury was a cave-in on a New Orleans city street, property was considered "the object" with respect to the issue of custody).

Thus, to prevail on a custodial liability claim, Holmes must demonstrate: "(1) the object was in the defendant's custody; (2) the thing contained a vice or defect which presented an unreasonable risk of harm to others; (3) the defective condition caused the damage; and (4) the defendant knew or should have known of the defect." Cormier v. Dolgencorp, Inc., 136 Fed.Appx. 627, 627-28 (5th Cir. 2008).

3.  Principal Liability

In Louisiana, absent two exceptions, a principal cannot be liable for injuries resulting from the negligent acts of an independent contractor "unless (1) the liability arises from ultrahazardous activities performed by the contractor on behalf of

the principal formed by the contractor on behalf of the principal or (2) the principal retains operational control over the contractor's acts or expressly or impliedly authorized those acts." Coulter v. Texaco, Inc., 117 F.3d 909, 912 (5th Cir. 1997)(citation omitted).  Of course, a principal remains liable for its own acts of negligence.  Graham v. Amoco Oil Co., 21 F.3d 643, 645 (5th Cir. 1994).

Shell contends that it is not responsible for the alleged negligence of Petrofac because no ultrahazardous activity took place, nor was Shell exercising operational control over Petrofac's HUET training course.  The Shell-Petrofac contract and other record evidence confirms Shell's argument absolving it of principal liability.  The plaintiff concedes that Shell is not answerable for Petrofac's alleged negligence.  Rather, the plaintiff seeks to hold Shell accountable for its own alleged negligence in failing to post warnings on its property directed to trainees, like Holmes, who had pre-existing back injuries.  The issue of principal liability is not in dispute.  The Court now turns to consider whether Shell and Petrofac are entitled to summary judgment dismissing the plaintiff's ordinary negligence and custodial liability claims.

*B.*

1. Was Shell Negligent?

(a) Duty/Risk

The parties dispute the threshold duty element.  "In deciding

15

whether to impose a duty in a particular case" -- an issue of law -- "Louisiana courts examine 'whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty.'" See Audler v. CBC Innovis Inc., 519 F.3d 239, 249 (5th Cir. 2008)(quoting Faucheaux v. Terrebonne Consol. Gov't, 615 So.2d 289, 292 (La. 1993)).

Holmes insists that Shell owed him (and other trainees) a legal duty to warn trainees with pre-existing back injuries and surgery of the dangers of undergoing HUET training.  Shell counters that it had no duty to warn under the circumstances presented here, where its independent contractor was contracted to and conducted, supervised, and performed the HUET course instruction and training. The Court agrees.

"[A] cause of action for failure to warn does not exist unless there is an affirmative duty to provide a warning." Audler v. CBC Innovis Inc., 519 F.3d 239, 254 (5th Cir. 2008)(citing Fryar v. Westside Habilation Ctr., 479 So. 2d 883, 889 (La. 1985)). "[L]iability [for failure to warn] is dependent on an underlying, affirmative duty imposed by contract, custom, or social policy." Fryar, 479 So. 2d at 889.  In other words, Louisiana law imposes an affirmative duty to warn under only limited circumstances.  Here, there is no contract that imposes such a duty.  In fact, the only basis for imposing on Shell an affirmative duty to warn that is

advanced by the plaintiff here is that Shell, as owner of the training premises, had custody over the training premises and simulator.

(b) Custodial Liability

The plaintiff submits that Shell owned the property and the injury-causing simulator, but failed to post any warning signs. As owner, the plaintiff insists, Shell owed a legal duty to warn trainees with pre-existing back injuries and surgery of the dangers of undergoing HUET training. Shell counters that Civil Code articles 2317, 2317.1, and 2322 are only applicable to establish liability when there is a "vice" or "defect" in a "thing" or the premises; or, in the case of article 2322, damage caused by the "ruin" of a building. The Court agrees.

There is no allegation, let alone evidence of record, indicating that the simulator or training premises were defective. The plaintiff does not suggest that the simulator broke during training, causing his injury, or that the reckless operation of the simulator caused his injury. Rather, the plaintiff's flawed theory of liability against Shell simply is that there were no warning signs, which plaintiff submits, constitutes a defective condition.

On this record, custodial liability is wholly absent. The record shows that Petrofac maintained custody and that Shell had contractually delegated to Petrofac the right to direct and control the training, including the HUET training premises, pool, and

simulator.  Moreover, imposing custodial liability in a failure-to-warn context, when safety warnings for safety training were indisputably provided by the company conducting the training, simply does not fit; this is so because the failure to warn allegation cannot be conceptually divorced from the operational aspects of the HUET training conducted by Petrofac.[10]  The plaintiff has simply failed to invoke any case literature on point.[11]  His argument that Shell's duty to warn is similar to the duty of amusement park owners to post warnings on or near the rides falls short.  Holmes was allegedly injured during an emergency training exercise conducted solely by Petrofac.  The record supports Shell's argument that it did not supervise the training, that it had no personnel present during the training, and that Petrofac had control over the pool area, the simulator, and the operational

---

[10]This is not a premises defect case in the classic sense. There is no evidence suggesting that the helicopter simulator had any relevance or presented any danger outside of the context of training exercises conducted and supervised by Petrofac.

[11]Plaintiff invokes <u>Miller v. Broussard</u>, 430 So. 2d 330 (La. App. 3d Cir. 1983), in which the state appellate court held that the restaurant's placement of prominent warning signs on restroom door rendered an otherwise defective steep step non-defective.  <u>Miller</u> is distinguishable; there was a known defect with the premises.  As the Court already noted, when injury is caused by a specific thing, that thing is considered "the object" with respect to the issue of custody; and, the property on which the injury occurred is not considered "the object" unless an inherent defect in the property caused the injury.  Here, the plaintiff fails to articulate a "condition" associated with the training facility that is inherently defective.  The failure to warn of which the plaintiff complains here is with respect to the mechanics of the training, not the premises or equipment used.

aspects of the training.  The administration of warnings and the
vetting of trainees' medical conditions was delegated to, the
responsibility of, and took place by Petrofac, Shell's independent
contractor.  Putting aside whether the plaintiff has adequately
articulated a "defect" in a "thing", absent custody and control
over the training area, Shell did not, as a matter of law, have
custodial liability.[12]

Because there is no genuine issue of material fact concerning
the duty to warn theory of liability advanced against Shell, Shell

_____

[12]In compliance with Local Rule 56.1, Shell submitted a
statement of material facts as to which it contends there is no
genuine issue to be tried.  The plaintiff, however, merely submits
a list of four facts that he alleges are genuinely disputed: (1)
whether or not Shell had actual or constructive knowledge of the
dangers of undergoing HUET training with pre-existing back injuries
and surgery; (2) whether or not Shell had actual or constructive
knowledge of the inadequacy of the warning process with regard to
trainees with pre-existing back injuries and surgery; (3) whether
or not plaintiff was verbally vetted concerning his pre-existing
back injuries and surgery; (4) whether or not Shell or Petrofac, or
both, had custody or garde over the helicopter simulator and
adjacent areas.  This complies, in part, with Local Rule 56.2 (in
that plaintiff submitted a statement of material facts as to which
he contends there exists a genuine issue to be tried).  But the
plaintiff fails to controvert all material facts in Shell's
statement and, thus, those facts not controverted are deemed
admitted for the purposes of Shell's motion.  See Local Rule 56.2
("[a]ll material facts set forth in the statement required to be
served by the moving party will be deemed admitted, for the
purposes of the motion, unless controverted as required by this
rule.").  Even absent this consequence of procedure, the Court
notes that only the plaintiff's fourth allegedly disputed fact was
relevant to the analysis.  But the facts of record are not
genuinely disputed: to the extent custodial liability is a
reasonable theory of liability to advance here, Shell indisputably
delegated all control over the training (including the pool and
simulator, neither of which are alleged to be defective) to
Petrofac.

is entitled to summary judgment dismissing all of Holmes' claims against it.

2. Was Petrofac Negligent?

Although it appears that Petrofac disputes whether it owed Holmes a duty, the Court need not indulge any quarrel over this threshold element, given that there is no dispute that Petrofac gave warnings to trainees, thus assuming a duty, in connection with the training it conducted. An affirmative duty to warn a trainee regarding the dangers of participating in a strenuous emergency training exercise reasonably exists under these circumstances. The true dispute centers on breach, in particular, whether the warnings given were incomplete or inadequate: Holmes contends that specific inquiries concerning prior neck or back injuries or surgeries should have been included in the training literature or instruction. In other words, the plaintiff submits that a genuine dispute concerning the adequacy of the warnings precludes summary judgment. The Court agrees.

Petrofac submits that it met all of the standard operating procedures in the industry relating to its HUET training when Holmes participated, including requiring trainees to complete a form certifying that the trainee was physically capable of performing the training; Holmes acknowledged that he was warned and understood the training; H&P had repeatedly medically cleared Holmes to work hard labor jobs offshore with no restrictions;

Holmes himself had participated in similar, if not identical HUET training four years prior to April 2011 (but still after his back surgery), without incident; Holmes did not feel that he had any medical or physical issues that would prevent him from going through the training program.

On the other hand, the plaintiff submits that no specific inquiry was made regarding prior back or neck injuries or surgeries in the form used by Petrofac; the form completed by Holmes failed to disclose twisting and contorting motions required to egress the underwater simulator; a marine survival team leader for Petrofac testified that if he became aware that a trainee had a pre-existing back or neck problem, he would forbid that trainee from participating without a doctor's release; a new form that Petrofac now uses specifically inquires if trainees have had neck or back injuries (although it is doubtful that this would be admissible under Rule 407 of the Federal Rules of Evidence); no one at the training facility cautioned Holmes about the fact that he had prior back surgery.

Whether Petrofac breached its duty to Holmes is a fact-driven question that is not appropriate for summary judgment on this record. The strength of plaintiff's claims against Petrofac might, however, turn out to be problematical in view of the form Holmes

completed and signed.[13]

### III.

### *A.*

The Louisiana Oilfield Anti-Indemnity Act was enacted to invalidate defense and indemnity provisions contained in certain contracts pertaining to a well that require the indemnification of an indemnitee against the consequences of its own negligence.  The Act provides, in part:

> A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.
>
> B.  Any provision contained in, collateral to, or

---

[13]Petrofac argues in a conclusory fashion that causation is lacking simply because Holmes had participated in the training on a prior occasion.  It is the plaintiff's position, of course, that had sufficient warnings been given, or inquiries made, Holmes would not have participated in the training without a medical release.  The papers on this point are inadequate for the Court to resolve the causation issue.

The Court also observes that some of the arguments advanced by Petrofac go to the issue of contributory negligence, which is an issue for trial.  This, and the issue concerning the plaintiff's delayed reporting of his alleged injury, are some of the many proof problems to be resolved by the jury.  All counsel should evaluate their litigation risks in advance of trial.

affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals ... is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C.  The term "agreement" as it pertains to a well for oil, gas, or water, or drilling for minerals ..., as used in this Section, means any agreement or understanding, written or oral, concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals ..., including but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or excavating, constructing, improving, or otherwise rendering services in connection with any mine, shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

La.R.S. 9:2780.

In Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co., the Fifth Circuit articulated a two-part test to determine if the LOAIA applies to invalidate an indemnity provision in a contract.  953 F.2d 985, 991 (5th Cir. 1992).  First, the contract must pertain to a well.  Id.  Second, the contract must be related to exploration, development, production, or transportation of oil, gas, or water.  Id.  To invalidate an indemnity provision, both parts of the test must be satisfied.  Id.

To determine whether the contract pertains to a well, the Fifth Circuit has instructed that courts consider a list of 10 non-exclusive factors:

(1)   whether the structures or facilities to which the contract applies or with which is associated, e.g., production platforms, pipelines, junction platforms, etc., are part of an in-field gas gathering system;

(2)   what is the geographical location of the facility or system relative to the well or wells;

(3)   whether the structure in question is a pipeline or is closely involved with a pipeline;

(4)   if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities;

(5)   whether the pipeline is a main transmission or trunk line;

(6)   what is the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like;

(7)   what is the purpose or function of the facility or structure in question;

(8)   what if any facilities or processes intervene between the wellhead and the structure or facility in question, e.g., "heater treaters," compressor facilities, separators, gauging installations, treatment plants, etc.;

(9)   who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question;

(10)   and any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.

Id. at 994-95.

*B.*

As an affirmative defense to Shell's third-party complaint for defense and indemnity, H&P asserts that the indemnification provision of the training agreement is void under the Act.  Shell

24

contends that the training agreement is outside the scope of the Act, and that it is therefore entitled to defense and indemnity as a matter of law.  The Court is inclined to agree.  Nevertheless, the Court need not determine which agreement is the relevant agreement, apply the <u>Transcontinental</u> factors, or otherwise resolve the parties' dispute concerning whether or not the training agreement pertains to a well because, by its express terms, the LOAIA does not apply where the indemnitee is not at fault.  <u>See</u> La.R.S. 9:2780; <u>see also</u> <u>Am. Home Assurance Co. v. Chevron, USA, Inc.</u>, 400 F.3d 265, 271 (5th Cir. 2005); <u>see also</u> <u>Meloy v. Conoco, Inc.</u>, 504 So. 2d 833, 838 (La. 1987)(indemnity agreements "are voided only to the extent that they purport to require indemnification and/or defense where there is negligence or fault on the part of the indemnitee; otherwise, they are enforceable as any other legal covenant").  This Court has determined that summary judgment dismissing the plaintiff's claims against Shell is warranted.  Accordingly, the indemnity agreement is not void where, as here, there has been a determination that the indemnitee was not at fault.  Shell is entitled to judgment as a matter of law for contractual defense or indemnity against H&P.  Of course, as H&P points out, Shell has demanded defense and indemnity against other parties in this litigation such that it might only have shared liability for the cost of Shell's defense and indemnity.

Accordingly, Shell's motion for summary judgment dismissing

25

the plaintiff's claims against it is GRANTED; Shell's motion for summary judgment that H&P owes it defense and indemnity is GRANTED; and Petrofac's motion for summary judgment is DENIED.

New Orleans, Louisiana, June 26, 2014

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE